**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| **BILLIE G. DOUGLAS,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | Case No. 13-CV-32-PJC |
| ) | |
| **CAROLYN W. COLVIN,** ) | |
| **Acting Commissioner of the** ) | |
| **Social Security Administration,**[1] ) | |
| ) | |
| **Defendant.** ) | |

**OPINION AND ORDER**

Claimant, Billie G. Douglas ("Douglas"), pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying her applications for disability insurance benefits and supplemental security income benefits under the Social Security Act, 42 U.S.C. §§ 401 *et seq*. In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge. Any appeal of this order will be directly to the Tenth Circuit Court of Appeals. Douglas appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that Douglas was not disabled. For the reasons discussed below, the Court **REVERSES AND REMANDS** the Commissioner's decision.

---

[1] Pursuant to Fed. R. Civ. P. 25(d)(1), Carolyn W. Colvin, the current Acting Commissioner of the Social Security Administration, is substituted for Michael J. Astrue as Defendant in this action. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

**Claimant's Background**

Douglas was 48 years old at the time of the hearing before the ALJ on April 26, 2012. (R. 49, 30). Douglas graduated from high school. (R. 56). She last worked May 25, 2010 for an oilfield company as a "winder." (R. 61-62). She testified that she was let go due to problems with her breathing and a hospitalization that made her miss work. (R. 62). She said that her doctor also had taken her "off work completely" due to her lung problems and due to her inability to be in the work environment required for her job as a winder. (R. 62-63). Douglas testified that there were chemicals used in her work environment that caused fumes. (R. 63).

Douglas testified that she had been missing one to three days of work a week because she felt bad, and when she went to the doctor, she discovered that she had double pneumonia. (R. 63). She then had surgery in September to remove half of her right lung. (R. 63-64). Douglas said that since the surgery she had difficulty breathing in environmental conditions such as cold, heat, and humidity. (R. 64). She felt tired all the time. *Id.* She coughed constantly. (R. 74). She was not on any medications, because her surgeon told her that medications such as inhalers did not help and were a waste of money. (R. 64).

Douglas said that she could walk about "two house lengths" before getting winded and needing to rest. (R. 66). She could sit in one position for about 30 or 45 minutes before needing to changes positions and lie down. *Id.* She would need to lie down for about 30 minutes before being able to return to a sitting position. *Id.* She spent a lot of time during the day lying down. (R. 66-67). If she did chores around the house for 10 or 15 minutes, she would then lie down for 30 or 45 minutes. *Id.* She took a nap of about two hours most days. (R. 67).

Douglas testified that she had difficulty sleeping at night because she had trouble breathing when she was in a flat position. *Id.* She said that she felt as though she was drowning, and she coughed all night. *Id.* She tried, unsuccessfully, to prop herself up with pillows at night, and she was trying to purchase a wedge pillow similar to the one they used at the hospital. (R. 67-68). *Id.* She only slept two to three hours at night, and when she woke up she was not rested or refreshed. (R. 68).

Douglas testified that she had experienced trouble with her right shoulder after the surgery. (R. 68-69). She said that the doctor told her that opening her ribs had caused the nerves on the right side to be "crushed." *Id.* She also experienced pain and numbness from her wrist all the way around her right side. (R. 73). She had trouble raising her right arm or lifting with it. (R. 69). She thought she could lift about seven pounds with her right hand. *Id.* She usually lifted things with both hands. *Id.* She tried not to reach over her head with her right arm because it felt weak. *Id.*

Before May 2010 when she quit working, Douglas had experienced mobility problems with her left shoulder and was diagnosed with frozen shoulder. (R. 70). She had a cortisone shot to help regain mobility, but she still had problems with it. *Id.* She thought she could lift about seven pounds with her left hand. *Id.* Her three children helped her with lifting and with all household chores. (R. 70-71). For chores such as folding clothes, Douglas didn't have trouble doing the folding, but she took her time completing the task. *Id.* If her arms felt tired, she would wait to do that chore another time. (R. 71).

Douglas testified that her children went with her to go grocery shopping and that she did not carry the groceries. *Id.* She could not do chores such as sweeping or vacuuming due to her difficulty breathing. *Id.* She did not do any yard work. *Id.*

Douglas said that she did not leave the house three or four days a week. *Id.* She was tired and exhausted all of the time. *Id.* She did not go to events outdoors because she was afraid she would get pneumonia. (R. 72). She did not have any problems driving as long as she could breathe. *Id.* At the time of the hearing, Douglas's mother had been in the hospital for a lengthy time. (R. 74-76). She could not drive the distance involved to see her mother. *Id.* If someone drove her there, Douglas was emotionally and physically exhausted after the visit. (R. 75-76).

Douglas said that she did not go to the doctor very often in part because she felt that if she had received proper treatment it would not have been necessary to remove part of her lung. (R. 72-73). She had previously tried an antidepressant, but she had discontinued it because it had made her feel emotionless. (R. 74-75).

Douglas testified that she could not work at a job in an office environment where she could sit or stand. (R. 73). She thought she would become tired after 30 minutes or an hour and would have difficulty breathing. *Id.*

Douglas was seen at Hillcrest Medical Group on February 26, 2008 with a cough and back pain. (R. 256-57). On examination, she had markedly diminished breath sounds on the right side. (R. 257). A chest x-ray apparently indicated chronic obstructive pulmonary disease ("COPD"), and Douglas was referred for a CT scan of her chest. *Id.* The results of the CT scan were abnormal, and the next day Douglas was referred for a pulmonology evaluation. (R. 254-55). On March 12, 2008, her physician said that she should remain off work. (R. 252-53). On March 27, 2008, she was started on a trial of Spiriva and referred for additional lab work. (R. 250-51).

Tests were done at the Oklahoma State University Medical Center (the "OSU Hospital") on May 14, 2008, including a pulmonary function test. (R. 315, 325,). An expiration flow limitation was observed that indicated the presence of obstructive lung disease. *Id.* The degree of obstruction was classified as mild, and a bronchodilator challenge did not improve her spirometric air flow. *Id.* The impression from chest x-rays was emphysema. (R. 325).

On May 28, 2008, Douglas's physician at Hillcrest Medical Group said that she would be unable to return to her previous job, she had maximum medical improvement, and she had permanent limitations due to her shortness of breath. (R. 248-49). Douglas saw her physician several times between the May 2008 appointment and an appointment on December 23, 2009, when she complained of left shoulder pain and decreased range of motion. (R. 230-47).

Hand-written records indicate that Douglas saw Robert D. Baker, D.O. in Mannford Oklahoma from March 2010 to August 2010. (R. 344-49). Assessments on March 10, 2010 appear to be COPD by history, bronchitis, sinusitis, tobacco abuse, and hypertension. (R. 344). Records in April 2010 appear to state that Douglas was released to return to work. (R. 345). On June 8, 2010, Dr. Baker wrote that Douglas might have pneumonia, and he assessed shortness of breath, hoarseness, and tobacco abuse. (R. 346). X-rays of Douglas's chest on June 8, 2010 were compared to September 18, 2008 images, and the finding was no acute disease and no significant change. (R. 363).

Dr. Baker referred Douglas to Brian D. Worley, M.D. of Pulmonary Medicine Associates, Inc., who saw her for a consultation on July 19, 2010. (R. 347, 360-61). Dr. Worley's assessments were COPD, chronic cough, and tobacco abuse. (R. 361). He advised that Douglas should continue Symbicort, should add Spiriva and Prilosec, and should stop using tobacco products. *Id.*

When he saw Douglas on July 30, 2010, Dr. Baker wrote again that she might have pneumonia. (R. 348).

Douglas was hospitalized at the OSU Hospital from August 6, 2010 to August 10, 2010. (R. 294-305, 316-18, 331-32, 336-42). The discharge summary reflects that Douglas had originally presented to the emergency room, and a CT scan of her chest showed several abnormalities in her lungs. (R. 294-95). Douglas left against medical advice. *Id.* Discharge diagnoses were right-sided pneumonia, dyspnea with a note regarding uncertainties in final diagnosis, pulmonary fibrosis, tobacco abuse, resolved hemoptysis, and acute febrile illness. (R. 294).

After leaving the OSU Hospital on August 10, 2010, Douglas presented to Saint Francis Hospital, and she was admitted (R. 415-17). A chest x-ray showed pneumonia in both lungs and a possible defect on the right side. (R. 415). She was discharged on August 17, 2010 with possible pulmonary emboli on both sides, for which she was taking anticoagulants. (R. 413-14). Her pneumonia was resolved, and she was assessed with exacerbated COPD and tobacco dependence. *Id.* A pulmonary consultation completed while she was hospitalized noted that she had "multiple ongoing issues." (R. 419).

Douglas saw Dr. Baker on August 20, 2010, and she was fatigued and had swelling of her legs. (R. 349).

Additional testing was done at Saint Francis Hospital on August 25, 2010 that showed "[d]ecreased perfusion to the right lung with peripheral decreased activity of the right upper lobe and right midlung." (R. 410). A pulmonary angiogram was completed on September 3, 2010 and findings were "consistent with bilateral pulmonary emboli, right much worse than left." (R. 407-08).

Douglas was hospitalized at Saint Francis Hospital from September 22-28, 2010. (R. 382-400). Surgical procedures completed were "[r]ight thoracotomy with multiple bullectomy of the right lower lobe" and "[m]echanical pleurectomy and talc pleurodesis." (R. 382). The final diagnosis was "[s]evere bullous emphysema of the right lower lobe." *Id.* Post-operative x-rays done on October 12, 2010 continued to show "[p]ersistent infiltrate in the right lung with pleural fluid" and "patchy infiltrate in the left lung base." (R. 380). A post-operative note from Robert B. Mammana, M.D. on that same date said that Douglas was doing well and was back to work. (R. 457).

Douglas saw Dr. Mammana on January 13, 2011, and he noted that Douglas denied shortness of breath. (R. 518). He said that she was "doing quite well," and he said that "equal and bilateral breath sounds" were present on examination. *Id.* On September 14, 2011, however, additional spirometry was completed by Dr. Mammana, and he wrote a letter dated October 26, 2011, explaining the results. (R. 543-44). Dr. Mammana said that Douglas continued to complain of shortness of breath. (R. 543). He said that the pulmonary function studies showed that Douglas did have "moderately severe obstructive lung disease." *Id.*

Douglas was seen on May 4, 2011 at Warren Clinic Urgent Care as a new patient. (R. 558-61). Douglas presented with a cough, head congestion, and chest congestion that had been ongoing for 4-5 days. (R. 558). Douglas was assessed with acute bronchitis and prescribed antibiotics. (R. 559-60). X-rays taken at that time appear to reflect post-surgical changes, but no acute active disease. (R. 561). Douglas was seen again on December 6, 2011 with similar symptoms. (R. 547-50). A CT scan and x-rays of Douglas's lungs appear to have reflected no acute disease. (R. 551-53).

Agency examining consultant Maribeth Spanier, Ph.D., completed a mental status examination of Douglas on December 14, 2010, and Douglas denied depression. (R. 510-15). Douglas explained that previous symptoms of depression had been due to the deaths of her father and grandmother that occurred within months of each other. (R. 511). On Axis I,[2] Dr. Spanier diagnosed Douglas with "[p]ain [d]isorder, due to partial lung removal." (R. 514). She assessed Douglas's Global Assessment of Functioning ("GAF")[3] as 60 with the parenthetical comment that this score was "from pain." *Id.*

Agency nonexamining consultant Dorothy Millican-Wynn, Ph.D. completed a Psychiatric Review Technique Form on January 29, 2011, finding that Douglas's mental impairments were not severe, but she had coexisting nonmental impairments. (R. 519-32). For Listing 12.04, Dr. Millican-Wynn noted depression that did not precisely satisfy the diagnostic criteria. (R. 522). For Listing 12.07, Dr. Millican-Wynn noted Douglas's pain disorder as a medically determinable impairment that did not precisely satisfy the diagnostic criteria of a somatoform disorder. (R.

---

[2] The multiaxial system "facilitates comprehensive and systematic evaluation." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 27 (Text Revision 4th ed. 2000) (hereinafter "DSM IV").

[3] The GAF score represents Axis V of a Multiaxial Assessment system. *See* DSM IV at 32-36. A GAF score is a subjective determination which represents the "clinician's judgment of the individual's overall level of functioning." *Id.* at 32. The GAF scale is from 1-100. A GAF score between 21-30 represents "behavior is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment . . . or inability to function in almost all areas." *Id.* at 34. A score between 31-40 indicates "some impairment in reality testing or communication . . . or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." *Id.* A GAF score of 41-50 reflects "serious symptoms . . . or any serious impairment in social, occupational, or school functioning." *Id.*

525). For the "Paragraph B Criteria,"[4] Dr. Millican-Wynn found that Douglas had no restriction of activities of daily living, no difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, or pace, with no episodes of decompensation. (R. 529). In the "Consultant's Notes" portion of the form, Dr. Millican-Wynn briefly summarized Dr. Spanier's report, and she again reiterated her conclusion that Douglas's "allegations are non-severe." (R. 531).

Nonexamining agency consultant Luther Woodcock, M.D., completed a Physical Residual Functional Capacity Assessment on February 16, 2011. (R. 533-40). For exertional limitations, Dr. Woodcock found that Douglas could perform light work. (R. 534). In the space for narrative comments, Dr. Woodcock reviewed Douglas's history of lung surgery in September 2010 and her October 2010 post-operative visit at which she was doing well. *Id.* For environmental limitations, Dr. Woodcock found that Douglas should avoid even moderate exposure to fumes, odors, dusts, gases, and poor ventilation. (R. 537). Dr. Woodcock found no other environmental limitations, and he found that no postural, manipulative, visual, or communicative limitations were established. (R. 535-37).

---

[4] There are broad categories known as the "Paragraph B Criteria" of the Listing of Impairments used to assess the severity of a mental impairment. The four categories are (1) restriction of activities of daily living, (2) difficulties in maintaining social functioning, (3) difficulties in maintaining concentration, persistence or pace, and (4) repeated episodes of decompensation, each of extended duration. Social Security Ruling ("SSR") 96-8p; 20 C.F.R. Part 404 Subpt P, App. 1 ("Listings") § 12.00C. *See also Carpenter v. Astrue*, 537 F.3d 1264, 1268-69 (10th Cir. 2008).

## Procedural History

Douglas filed applications in September 2010 for Title II disability insurance benefits and for Title XVI supplemental security income benefits under the Social Security Act, 42 U.S.C. §§ 401 *et seq.* (R. 154-66). Douglas alleged onset of disability as of February 21, 2008. (R. 160). The applications were denied initially and on reconsideration. (R. 93-101, 104-09). A hearing before ALJ John W. Belcher was held on April 26, 2012. (R. 49-82). By decision dated May 25, 2012, the ALJ found that Douglas was not disabled. (R. 36-44). On November 26, 2012, the Appeals Council denied review of the ALJ's findings. (R. 1-6). Thus, the decision of the ALJ represents the final decision of the Commissioner for purposes of this appeal. 20 C.F.R. §§ 404.981, 416.1481.

## Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability

claim. 20 C.F.R. § 404.1520.[5]  *See also Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988) (detailing steps).  "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary."  *Id.*

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g).  This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied.  *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion.  *Id.*  The court's review is based on the record taken as a whole, and the court will "meticulously examine the record in order to determine if the evidence supporting the agency's decision is substantial, taking 'into account whatever in the record fairly detracts from its weight.'"  *Id.*, (*quoting Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994)).  The court "may neither reweigh the evidence nor substitute" its discretion for that of the Commissioner.  *Hamlin,* 365 F.3d at 1214 (quotation omitted).

---

[5] Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510.  Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities.  *See* 20 C.F.R. § 404.1520(c).  If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied.  At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings").  A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry.  If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work.  If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform.  *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001).  Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work.  20 C.F.R. § 404.1520.

**Decision of the Administrative Law Judge**

The ALJ found that Douglas met insured status requirements through December 31, 2014. (R. 38). At Step One, the ALJ found that Douglas had not engaged in substantial gainful activity since her amended alleged onset date of May 26, 2010. *Id.* At Step Two, the ALJ found that Douglas had severe impairments of "emphysema, partial lung removal, [and] right shoulder trauma secondary to operation." *Id.* The ALJ found that Douglas's depression was nonsevere. (R. 38-39). At Step Three, the ALJ found that Douglas's impairments did not meet any Listing. (R. 39).

The ALJ determined that Douglas had the RFC to perform light work except that she should avoid fumes, odors, dusts, toxins, gases, and poor ventilation. (R. 40). At Step Four, the ALJ found that Douglas could perform her past relevant work. (R. 43). Thus, the ALJ found that Douglas was not disabled from May 26, 2010 through the date of the decision. *Id.*

**Review**

Douglas presents four arguments on appeal to this Court. First, she states that the ALJ erred in his consideration of the treating physician opinion evidence. Plaintiff's Opening Brief, Dkt. #15, pp. 2-3. Second, she asserts that the ALJ did not include all of her impairments in his RFC and in his hypothetical to the vocational expert (the "VE"). *Id.* Third, she states that the ALJ erred at Step Four. *Id.* Finally, she asserts that the ALJ's credibility assessment was not adequate. *Id.* The Court finds that the ALJ's decision must be reversed because it did not give sufficient reasons for finding Douglas less than fully credible. Because reversal is required due to errors in the ALJ's credibility assessment, the other issues raised by Douglas are not addressed.

Credibility determinations by the trier of fact are given great deference. *Hamilton v. Secretary of Health & Human Services,* 961 F.2d 1495, 1499 (10th Cir. 1992).

> The ALJ enjoys an institutional advantage in making [credibility determinations]. Not only does an ALJ see far more social security cases than do appellate judges, [the ALJ] is uniquely able to observe the demeanor and gauge the physical abilities of the claimant in a direct and unmediated fashion.

*White v. Barnhart,* 287 F.3d 903, 910 (10th Cir. 2002). In evaluating credibility, an ALJ must give specific reasons that are closely linked to substantial evidence. *See Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995); Social Security Ruling 96-7p, 1996 WL 374186. "[C]ommon sense, not technical perfection, is [the] guide" of a reviewing court. *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1167 (10th Cir. 2012).

This reviewer has been unable to find any discussion of Douglas's credibility that approaches the required standard of specific reasons closely linked to substantial evidence. The only language addressing credibility is a boilerplate provision that Douglas's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (R. 41). After this introductory statement, the ALJ discussed the MRI of Douglas's left shoulder in January 2010. *Id.* He discussed Douglas's hospitalizations in August 2010 and her surgery in September 2010. *Id.* He recounted pulmonary function tests, including the September 2011 test one year after Douglas's surgery that showed moderately severe obstructive disease was present in Douglas's lungs. (R. 41-42).

The ALJ then summarized the mental status examination report of agency consultant Dr. Spanier in some detail. (R. 42). He then briefly summarized the reports of nonexamining agency consultants Dr. Millican-Wynn and Dr. Woodcock. *Id.* He then devoted a paragraph to his

explanation of the weight he gave to the opinion evidence, stating that the limitations given by Dr. Woodcock were supported by the January 2011 office visit of Douglas with Dr. Mammana. (R. 43). Last, he summarized that his RFC determination was reasonable. *Id.* None of this discussion addressed Douglas's credibility, and there was no other discussion of her credibility in the ALJ's decision. The ALJ's discussion certainly does not meet the standard of credibility findings that are "closely and affirmatively linked to substantial evidence." *Kepler*, 68 F.3d at 391 (further quotation omitted).

The use of boilerplate language in Social Security disability cases was discussed and discouraged by the Tenth Circuit in *Hardman v. Barnhart*, 362 F.3d 676, 679 (10th Cir. 2004). The court explained that boilerplate language was a conclusion in the guise of findings, whereas the task of the ALJ is to explain the specific facts of the case before him and how those facts led him to his decision. *Id.* Boilerplate statements fail to inform the reviewing court "in a meaningful, reviewable way of the specific evidence the ALJ considered." *Id. See also Bjornson v. Astrue,* 671 F.3d 640, 644-46 (7th Cir. 2012) (opinion authored by Judge Posner criticizing Social Security Administration's use of "templates" in ALJ disability decisions). Here, the ALJ used some boilerplate language in his decision that referenced credibility, but there was no "more thorough" analysis that followed the boilerplate language. (R. 41-43). Lack of a credibility analysis by the ALJ requires reversal. *Hardman*, 362 F.3d at 678-81.

There may have been sufficient reasons with supporting evidence that could justify an adverse credibility determination, but the Court cannot make that determination without impermissibly substituting its judgment for that of the ALJ. *Allen v. Barnhart*, 357 F.3d 1140, 1144 (10th Cir. 2004) (court is not in a position to draw factual conclusions on behalf of the ALJ) (further quotations omitted). The Court also cannot supply reasons to support the ALJ's

14

credibility assessment that were not given by the ALJ himself.  Judicial review of an agency decision is limited to the analysis offered in the ALJ's decision, and it is improper for a reviewing court to offer a "post-hoc rationale" in order to affirm.  *Carpenter*, 537 F.3d at 1267.

Because the errors of the ALJ related to the credibility assessment require reversal, the undersigned does not address the remaining contentions of Douglas.  On remand, the Commissioner should ensure that any new decision sufficiently addresses all issues raised by Douglas.

This Court takes no position on the merits of Douglas's disability claim, and "[no] particular result" is ordered on remand.  *Thompson v. Sullivan*, 987 F.2d 1482, 1492-93 (10th Cir. 1993).  This case is remanded only to assure that the correct legal standards are invoked in reaching a decision based on the facts of the case.  *Angel v. Barnhart*, 329 F.3d 1208, 1213-14 (10th Cir. 2003), *citing Huston v. Bowen*, 838 F.2d 1125, 1132 (10th Cir. 1988).

## Conclusion

Based upon the foregoing, the Court **REVERSES AND REMANDS** the decision of the Commissioner denying disability benefits to Claimant for further proceedings consistent with this Order.

Dated this 21st day of October 2013.

_____
Paul J. Cleary
United States Magistrate Judge